**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| ORIUS CORP., | ) |
| | ) |
| Debtor-Appellant, | ) |
| | ) |
| and | ) |
| | ) |
| DEUTSCHE BANK TRUST COMPANY | ) |
| AMERICAS, | ) Nos. 06 C 6304 |
| | ) 06 C 6305 |
| Lender-Appellant, | ) 06 C 6306 |
| | ) |
| v. | ) Judge Rebecca R. Pallmeyer |
| | ) |
| QWEST CORPORATION, | ) |
| | ) |
| Appellee. | ) |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Qwest Corporation ("Qwest") is an incumbent local exchange carrier that provides telecommunications services in fourteen western states. Prior to December 12, 2005, Appellants, Orius Corporation and other joint debtors (collectively, the "Debtors"), contracted with Qwest to perform construction and maintenance work on Qwest's network. On December 12, 2005, the Debtors filed for bankruptcy and subsequently breached their contracts with Qwest by ceasing portions of their construction and maintenance work. During the course of the Debtors' bankruptcy proceedings, the Debtors and Qwest reached an agreement in order to streamline the process by which Qwest would pay the Debtors for the work the Debtors had performed under the contracts while also asserting claims for the money Qwest believed it was owed as a result of the Debtors' breach. The bankruptcy court's rulings relating to this agreement form the basis of this appeal.

First, the Debtors appeal the bankruptcy court's October 26, 2006 order directing the Debtors to pay Qwest money that Qwest claimed it was owed as a result of the Debtors' breach and the bankruptcy court's order denying the Debtors' motion for reconsideration of that ruling. Second, the Debtors appeal the bankruptcy court's November 7, 2006 order overruling their objections to certain portions of Qwest's claims. In this opinion, the court also addresses the appeal of Deutsche

Bank Trust Company Americas, a lender to the Debtors and agent for certain other lenders ("the Lenders"). The Lenders challenge the bankruptcy court's November 7, 2006 order striking the Lenders' objections to Qwest's claims on the grounds that the Lenders lacked standing. For the reasons set forth below, the court remands the case to the bankruptcy court for further consideration.

## BACKGROUND[1]

### A.    The Parties

Qwest provides various telecommunications services in fourteen western states of the United States as an incumbent local exchange carrier. (Qwest Resp. on Order Overruling Debtors' Objections at 3.) At some point prior to December 2005, Qwest entered into various construction contracts with Orius Corporation and its affiliated debtors; under these contracts, the Debtors agreed to perform certain construction and maintenance work on Qwest's telephone network and to serve as general contractors on projects Qwest had undertaken in Minnesota, Idaho, Oregon, and Washington. (Stipulation Between Debtors and Qwest Corporation Authorizing and Directing Payment of Monies to the Debtors, Establishment of Trust Accounts to Resolve Lien Rights, and the Establishment of Qwest Setoff Trust Account (the "Stipulation") ¶ A; Qwest Resp. on Order to Pay at 2.) The Debtors hired subcontractors to perform some of the work required under their

---

[1]    The parties' briefs are cited as follows:  Appellants' Brief on Appeal of Order Directing Debtors to Pay Qwest Corporation's Claims and Order Denying Debtors' Motion for Reconsideration of the Order Directing Debtors to Pay Qwest Corporation's Claims ("Debtors' Brief on Order to Pay"); Appellee Qwest Corporation's Brief in Response to Appellants-Debtors' Appeal of Payment Order ("Qwest Resp. on Order to Pay"); Appellants' Brief on Appeal of Order Overruling the Debtors' Objection to Claims of Qwest Corporation ("Debtors' Brief on Order Overruling Debtors' Objections"); Appellee Qwest Corporation's Brief in Response to Debtors' Appeal of Order Overruling Debtors' Objections ("Qwest Resp. on Order Overruling Debtors' Objections"); Consolidated Reply to Appellee Qwest Corporation's Brief in Response to Appellant-Defendants' Appeal of Payment Order and Appellee Qwest Corporation's Brief in Response to Debtors' Appeal of Order Overruling Debtors' Objections ("Debtors' Consolidated Reply"); Brief of Appellant Deutsche Bank Trust Company Americas ("Lenders' Brief"); Appellee Qwest Corporation's Brief in Opposition to Appellant Deutsche Bank Trust Company Americas' Brief ("Qwest Resp. to Lenders' Brief"); Reply Brief of Appellant Deutsche Bank Trust Company Americas ("Lenders' Reply").

contracts with Qwest. (Stipulation ¶ D.) The Debtors do not dispute that it was their responsibility to supervise their subcontractors and ensure that the subcontractor's work was completed to Qwest's specifications and that the subcontractors were paid in a timely manner. (Qwest Resp. on Order to Pay at 2.)

### B. Debtors' Bankruptcy Filing

On December 12, 2005, Orius Corporation and each of its affiliated debtors filed petitions for voluntary relief under Chapter 11 of Title 11 of the United States Code. (Debtors' Brief on Order to Pay at 4.) Pursuant to a pre-petition credit agreement between the Debtors and Lenders, the Debtors owed the Lenders approximately $109,939,000 at the time they filed for bankruptcy. (Lenders' Brief at 3.) The Debtors' obligations to the Lenders were "secured by liens on substantially all of the Debtors' assets including the Debtors' accounts receivable." (*Id.*) The Lenders assert that, because they are undersecured (a fact that Qwest does not contest), they have "significant secured claims and unsecured deficiency claims against the Debtors' estate." (*Id.*)

It is undisputed that the Debtors breached at least some of their contracts with Qwest after December 12, 2005. Indeed, after filing for bankruptcy, the Debtors informed Qwest that they would not be able to complete some of their work under the contracts and would instead be liquidating their assets. (Debtors' Brief of Order to Pay at 4; Qwest Resp. on Order to Pay at 3.) Qwest asserts that, when they breached their contracts, the Debtors "walked off their jobs in Minnesota; ceased supervising and paying subcontractors; failed to ensure that Qwest's deadlines and specifications were met; and failed to turn over necessary construction and maintenance materials, records, and contracts in connection with the jobs they abandoned." (Qwest Resp. on Order Overruling Debtors' Objections at 4.) As a result of the Debtors' breach, subcontractors also walked off jobs and asserted mechanic's liens and pre-lien notices against Qwest's property and its customers. (Qwest Resp. on Order to Pay at 3.) Despite their breach, the Debtors claim that they worked with Qwest to effect an orderly transition for some of the work that they were unable

to complete by, for example, maintaining employees in certain regions to wind-down projects. (Debtors' Brief on Order to Pay at 4-5.)

Qwest describes the fallout from the Debtors' breach as extensive. According to Qwest, the Debtors' breach created a risk that Qwest would face state and regulatory penalties for failing to meet certain construction and service deadlines. (Qwest Resp. on Order to Pay at 3.) Qwest claims, further, that the Debtors' breach forced Qwest to use "significant internal and external resources, including attorneys and its own employees, to perform management, supervision, inspection, construction, and maintenance services in the voids left by the Debtors." (*Id.* at 4.) For example, Qwest asserts that the Debtors' breach left it without a general contractor in Milwaukee, forcing Qwest to use internal resources that would not otherwise have been dedicated to that job. (*Id.*) Qwest also asserts that as a result of the Debtors' breach of their contract obligations, Qwest was required to negotiate and resolve "third-party and outside plant damages" that were the Debtors' obligations and pay to recover material and equipment that was improperly sold by the Debtors. (*Id.*) Qwest also claims that it incurred substantial costs when it hired outside counsel to negotiate with the Debtors to satisfy the claims of unpaid subcontractors and to negotiate a resolution process with the Debtors, which, according to Qwest, protected the Debtors from liability for massive penalties and other damages flowing from their breach. (*Id.* at 5.) In Qwest's view, the Debtors are contractually obligated to indemnify Qwest for costs and damages resulting from any breach, including Qwest's attorneys' fees and the cost to Qwest using its own employees to fill voids left by the Debtors. (*Id.* at 2.)

As of December 12, 2005, Qwest owed the Debtors millions of dollars in unpaid invoices for work the Debtors had performed under the contracts up to that point. (Debtors' Brief on Order to Pay at 5.) Qwest took the position that it was also owed monies from the Debtors as a result of the Debtors' breach and other damage claims and that it had the right to set off these amounts against the money it owed to the Debtors. (*Id.*; Stipulation ¶ E.) Qwest further claimed that it was

entitled to recoup or set off the unpaid amounts owed by Debtors to their subcontractors or suppliers because these unpaid subcontractors had asserted, or could assert, lien rights against Qwest's property or customers as a result of the Debtors' failure to pay the subcontractors for their services. (Debtors' Brief on Order to Pay at 5; Stipulation ¶ D.) Qwest refused to pay the Debtors for the work they had performed until a mechanism to resolve such claims was in place. (Debtors' Brief on Order to Pay at 5.) The Lenders assert that all money owed by Qwest to the Debtors for work performed by the Debtors and their subcontractors—the Debtors' accounts receivable—constitutes property of the Debtors' estate that is subject to the Lenders' senior liens. (Lenders' Brief at 4.)

### C. The March 3, 2006 Stipulation

Qwest and the Debtors engaged in extensive negotiations to reach an agreement to facilitate payment to the Debtors for work they had completed, while ensuring that Qwest would recover on its claims resulting from the Debtors' breach. On March 7, 2006, the bankruptcy court approved the Stipulation, which was proposed to the court by the Debtors and Qwest. The Stipulation aimed to "preserve Qwest's secured status, resolve all claims of unpaid subcontractors and suppliers, and assure that Qwest was paid for its allowable claims, while permitting the Debtors to collect from Qwest on their unpaid invoices." (Debtors' Brief on Order to Pay at 5; Qwest Resp. on Order to Pay at 6.) Prior to the bankruptcy court's approval of the Stipulation, the Debtors served the Lenders' counsel with a "Notice of Stipulation" and a motion for court approval of the Stipulation. (Qwest Resp. to Lenders' Brief at 5.) The Lenders did not object to the Stipulation when it was entered. (*Id.*)

Pursuant to the Stipulation, Qwest paid the Debtors the sum of $3,973,077.16, most of which was divided into funds to pay subcontractor claims. (Stipulation ¶ (a).)[2] Of that sum, the

---

[2] According to Qwest, in total, it has paid the Debtors in excess of $7.4 million for the services the Debtors provided before breaching their contracts. (Qwest Resp. on Order to Pay at

(continued...)

Stipulation required that $500,000 be set aside ("Qwest Setoff Reserve") to fund a trust account (the "Qwest Setoff Trust Account"). (*Id.* ¶ (c).) The Stipulation was clear that these funds and certain other funds earmarked for trust accounts were not part of the bankruptcy estate. The Stipulation barred any transfer of these funds to the Debtors' estate until Qwest's claims have been resolved. (*Id.* ¶¶ (g), (q) & (x).) The Stipulation further specified that none of its terms, "including Qwest's payment of monies" to the Debtors, would impair Qwest's right to recoupment against the Debtors. (*Id.* ¶ (t).)

The Stipulation defines "Qwest's Alleged Claims" as the money that Qwest has alleged it is owed from the Debtors "as a result of Debtors' breach of the Contracts or other damage claims, including (without limitation) claims arising from the Debtors' post-petition conduct." *Id.* ¶ E.) Under the Stipulation, if agreed upon by the Debtors or allowed by final order of the bankruptcy court, Qwest's Alleged Claims would be paid from the Qwest Setoff Trust Account. (*Id.* ¶¶ E, (g).) According to Qwest, the fund was necessary because all of its mitigation costs and breach damages were not known at the time the parties entered the Stipulation, and Qwest expected to incur additional costs from the past breach. (Qwest Resp. on Order to Pay at 7.) The parties specified that the Qwest Setoff Reserve was not intended to be a cap or limitation on Qwest's claims and that Qwest had until June 15, 2006 to file with the bankruptcy court a proof of claim or other pleading setting out its claims; that date could be extended by the consent of the parties or court order. (Stipulation ¶¶ (l)-(m).) Section (j) of the Stipulation, the interpretation of which is a focus of the Debtors' appeal, provides, in relevant part, that upon approval of the Stipulation, the Debtors waived and released the right to file any claims against Qwest. But, Section (j) also states that:

> [T]he Debtor, the estate, and any successor thereto reserve the right to object to the allowance and payment of Qwest's Alleged Claims. The waiver and release provided for in this paragraph (j) shall not be applicable or effective in the context

---

[2](...continued)

8.)

6

of an objection to the allowance of Qwest's Alleged Claims; provided, however, that the Debtor shall not have the right (i) to object to the allowance and payment of Qwest's Alleged Claims on the basis of any actions taken by Qwest to mitigate its damages following the Debtor's breach of any Contracts in any Region by completing jobs the Debtor did not complete in accordance with the specifications of any Contracts or on the basis of other costs incurred by Qwest as a result of the Debtor's breach of any Contracts or (ii) to seek any affirmative recovery against Qwest.

(*Id.* ¶ (j).)

The Stipulation recognized that the wind-down of the Debtors' work in certain regions could result in a materially different damage claim against the Debtors. (*Id.* ¶ (g).) In that event, Qwest reserved its right to petition the bankruptcy court to increase the amount of money in the Qwest Setoff Reserve. (*Id.*) Any balance remaining in the Qwest Setoff Trust Account after the resolution of Qwest's claims would be transferred to the Debtors and constitute property of the Debtors' estate. (*Id.* ¶ (l).)

Finally, the Stipulation recognized the Lenders' interest in the money in the Qwest Setoff Reserve. It stated that the Debtors' right, title and interest in any money payable to the Debtors pursuant to the Stipulation was "subject to the prepetition and postpetition security interests and liens of [the Lenders] . . . ." (*Id.* ¶ (x).) The Stipulation also acknowledged the Lenders' interest in future payments from Qwest, and provided that future payments would belong to the Debtors subject to superior claims in the following order of priority: (1) to fund subcontractor trust accounts; (2) to increase the amount of funds in the Qwest Setoff Reserve; and (3) to meet the Debtors' obligations with respect to the liens and security interests of the Debtors' lenders. (*Id.* ¶ (h).) Under Section (u) of the Stipulation, any disputes related to the Qwest Setoff Trust Account are subject to the jurisdiction of the bankruptcy court. (*Id.* ¶ (u).) The Stipulation is binding upon the Debtors, Qwest and "each of their successors and assigns, including any chapter 7 or chapter 11 trustee." (*Id.* ¶ (v).)

### D. Qwest's Proof of Claims

On June 13, 2006, Qwest submitted a proof of claim against the Qwest Setoff Reserve in

the amount of $378,032.57. (Qwest Resp. on Order to Pay at 8.) In Qwest's view, all of the amounts included in the claim "represent[ed] costs resulting from Qwest's mitigation or breach damages." (*Id.* at 9.) Qwest assets that the June 13, 2006 claim included attorneys' fees it incurred to address subcontractor lien issues and protect its rights in light of the Debtors' bankruptcy, including efforts to resolve regulatory fines and lien claims and Qwest's attorneys' efforts in negotiating the Stipulation. (*Id.*) Qwest also claimed the costs it incurred when it devoted personnel to manage the jobs the Debtors left, located replacement contractors, and resolved disputes concerning the Debtors' defective or incomplete work. (*Id.*) Of the $378,032.57 sum Qwest claimed on June 13, 2006, $138,013.76 was for attorneys' fees and $35,025.21 was for the cost of Qwest employees "stepping in to manage abandoned jobs" in Minnesota. (*Id.* at 10.) The Debtors object to Qwest's claim to these sums, though they do not dispute Qwest's right to be reimbursed money in the remaining categories listed in Qwest's June 13, 2006 proof of claim (e.g., "outside plant construction damages, settlement of third-party claims, recovery of wrongfully sold materials, relocation of materials to a new contractor, and Oregon and Southwest Washington Damages Claims"). (*Id.*) In this initial claim, Qwest stated that it "reserve[d] the right to amend [its] proof of claim and this rider as may be necessary to adjust the amount asserted herein or to supplement this claim in any way, including, but not limited to, liquidating, and claiming that all of its damages [were] a result of the Debtors' breaches of the Contracts." (June 13, 2006 Proof of Claim.)

Qwest subsequently filed four amendments to its proof of claim, each of which increased the total sum Qwest was asserting against the Qwest Setoff Reserve:

- August 14, 2006 - amendment increasing Qwest's total claim to $485,954.47
- September 13, 2006 - amendment increasing Qwest's total claim to $496,521.70
- November 9, 2006 - amendment increasing Qwest's total claim to $580,732.00
- November 9, 2006 - additional claim in an unliquidated amount that is a contingent liability that may result from two lawsuits relating, in part, to the Debtors' work

The Debtors claim that Qwest never sought an extension of the Stipulation's June 15, 2006

deadline for filing proofs of claim, (Debtors' Brief on Order to Pay at 7), while Qwest claims that it alerted the bankruptcy court and the Debtors in its initial proof of claim, filed on June 13, 2006, and its subsequent amendments, that its claims were not complete, and that it was still incurring damages which had not been fully tallied. (Qwest Resp. on Order to Pay at 24.) According to the Debtors, in addition to claiming a right to the money in the Qwest Setoff Trust Account, Qwest is also withholding the remaining $340,000 it owes to Debtors on the grounds that it is entitled to that sum. (Debtors' Brief on Order to Pay at 6.)

   **E.**  **Proceedings in Bankruptcy Court**

   On July 27, 2006, Qwest filed a motion to compel the Debtors to pay Qwest's claims totaling $378,032.57 from the Qwest Setoff Trust Account. (*Id.* at 7.) On August 7, 2006, the Debtors opposed this motion and filed an objection to certain claims asserted by Qwest. (*Id.*) Qwest filed a pleading on September 13, 2006 asserting, in relevant part, that the Debtors' objection must be overruled because the Debtors had waived their right to object to Qwest's claims as a part of the Stipulation. (Lenders' Brief at 7.) On October 26, 2006, Judge Bruce Block of the bankruptcy court issued an oral ruling holding that the Debtors had in fact waived their right to object to Qwest's claims. Interpreting Section (j) of the Stipulation, the bankruptcy court stated:

> The crucial part of paragraph J, it seems to me, is in the second half of the second sentence. . . .
>
> The second half of the second sentence is a proviso. And the language essentially is that debtor shall not have the right (1) to object, et cetera et cetera. And it ends several lines down with the phrase, or (2) to seek any affirmative recovery against Qwest. That seems to me to be the crux of the dispute. That proviso contains two instances of the phrase "on the basis of." And I have added from my own parsing of this a parenthetical (A) in front of the first "on the basis of;" and a parenthetical (B) in front of the second "on the basis of."
>
> It seems to me grammatically that both of these phrases modify the term right before them, which is "Qwest's alleged claims." Those "on the basis of" phrases do not modify the debtors' right to object. Consequently, under that reading, if Qwest asserts a claim based on its actions to mitigate damages by completing jobs that the debtor did not complete, the debtor has waived its right to object to those claims.

> Similarly, if Qwest asserts a claim based on other costs incurred by Qwest as a result of the debtors' breach of the contract, the debtor has waived its right to object. That's what I believe paragraph J says. It does not say what I think the debtor hopes it does say, and that is it does not say that the debtor has only waived its right to object on the basis of the claims not being through mitigation.

(October 26, 2006 Transcript of Proceedings, Case No. 05-63876 ("10/26/06 Transcript"), at 12-13.) Based on this reading of Section (j), the bankruptcy court entered an order directing the debtors to pay Qwest's claim in the amount of $378,032.57. (Debtors' Brief on Order to Pay at 7-8.) This order, entered on October 26, 2006, stated that the payment ordered was "without prejudice to Qwest's right to amend its Proof of Claim as may be necessary to adjust the amounts asserted therein or to supplement its claim in any way, including but not limited to asserting claims for additional damages resulting from the Debtors' breach of the Qwest Contracts and shall similarly be without prejudice to the Debtors' right to timely object to any supplemental or amended Proof of Claim." (Order Directing Debtors to Pay Qwest Corporation's Claims ¶ 3.) In an order dated November 7, 2006, the bankruptcy court denied the Debtors' objections to Qwest's claims, referencing only the reasons stated in open court on October 26, 2006—namely, that the Debtors had waived their right to object. (10/26/06 Transcript at 13.) On October 31, 2006, the Debtors filed a motion for reconsideration of the bankruptcy court's October 26, 2006 order directing the Debtors to pay Qwest. (Debtors' Brief on Order to Pay at 8.) Judge Black denied this motion for reconsideration on November 9, 2006, stating only that he was not convinced that there had been any manifest error of law in his previous ruling. (November 9, 2006 Transcript of Proceedings, Case No. 05-63876, at 12-13.)

Meanwhile, on October 3, 2006, the Lenders also objected to Qwest's claims. (Lenders' Brief at 7.) Qwest moved to strike the Lenders' objection on the ground that the Lenders lacked standing to object because Qwest's claims could be satisfied solely from non-estate property. (*Id.*) The Lenders responded that their recovery would be directly affected by the amount and allowance of Qwest's claims, regardless of the accounts used to pay them and that they had a right to object

to Qwest's claims as a party of interest pursuant to section 502(a) of the Bankruptcy Code. (*Id.*) In the October 26, 2006 proceeding, the bankruptcy court overruled and struck the Lenders' objection to Qwest's claims "on the basis that the bank has no objection, no standing to object because Qwest is seeking payment under the stipulation and under the fund which is not property of the estate." (10/26/06 Transcript at 14.) Judge Black entered an order striking the Lender's objection on November 7, 2006 for the reasons stated in open court. (11/7/06 Order, Case No. 05-63876.)

A number of other proceedings in the bankruptcy court affected the Lenders as a result of the Lenders' credit agreement with the Debtors. On January 10, 2006, the bankruptcy court entered an order authorizing the Debtors to use the Lenders' cash collateral to fund operations and provided the Lenders with additional post-petition security interests in all of the Debtors' property. (Lenders' Brief at 3.) On November 16, 2006, the bankruptcy court entered an order confirming the Debtors' liquidation plan; under the plan, the Lenders were to receive "approximately $26 million with respect to their secured claims and hold unsecured claims of approximately $84 million, which represents about 90% of all unsecured claims." (*Id.*)

On November 14, 2006, Qwest filed a petition to increase the amount of money in the Qwest Setoff Reserve, asserting that the amount of its claims exceeded the $500,000 then in the reserve, and requested an order that would require the Debtors to pay an additional $250,000 into the Qwest Setoff Reserve while reserving its right to file subsequent petitions as its growing claims required. (*Id.* at 8.) Both the Debtors and Lenders opposed this increase, and the bankruptcy court denied Qwest's petition. (*Id.* at 9.)

## DISCUSSION

In these appeals, the Debtors and Lenders contest various rulings of the bankruptcy court. The court addresses each of the contested rulings below.

### A.    Standard of Review

This court has subject matter jurisdiction over the Debtors' appeal from the bankruptcy court under 28 U.S.C. § 158(a)(1), which authorizes a district court's review of "final judgments, orders and decrees" issued by the bankruptcy court.[3]  In a bankruptcy appeal, the court reviews the bankruptcy court's factual findings for clear error.  *Dye v. U.S.*, 360 F.3d 744, 747 (7th Cir. 2004) (citing *In re Generes*, 69 F.3d 821, 824-25 (7th Cir. 1995)).  Clear error means that although there is evidence to support the findings, the court is "left with the definite and firm conviction that a mistake has been committed."  *In re Robert Sheridan*, 57 F.3d 627, 633 (7th Cir. 1995) (internal quotations and citations omitted).  "Conclusions of law are reviewed *de novo*."  *In re Robert Sheridan*, 57 F.3d at 633 (citing *Meyer v. Rigdon*, 36 F.3d 1375, 1378 (7th Cir. 1994).  Issues of contract interpretation involve conclusions of law and are therefore reviewed *de novo* or without any deference to the bankruptcy judge.  *Ha-Lo Indus., Inc. v. CenterPoint Props. Trust*, 342 F.3d 794, 797 (7th Cir. 2003) (citing *Shelby County State Bank v. Van Diest Supply Co.*, 303 F.3d 832, 835 (7th Cir. 2002)); *Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998) (citing *United States v. Admin. Enters.*, 46 F.3d 670, 674 (7th Cir. 1995)).

B.    Bankruptcy Court's Interpretation of Section (j)

Debtors first challenge the bankruptcy court's October 26, 2006 order directing the Debtors to pay Qwest's June 13, 2006 claim in the amount of $378,032.57 and the bankruptcy court's further decision denying the Debtors' motion for reconsideration of that order.  The Debtors argue that the bankruptcy court misinterpreted Section (j) of the Stipulation when it held that the Debtors could not object to a claim if Qwest asserted the claim was for actions taken to mitigate damages

---

[3]    The Debtors and Qwest do not disagree that this court has appellate jurisdiction over the bankruptcy court's order directing the Debtors to pay Qwest's claims and the order denying Debtors' motion for reconsideration of that order.  Qwest notes, however, that the bankruptcy court's order was final only with respect to the amount stated in Qwest's original proof of claim submitted on June 13, 2006 and was not a final order with respect to Qwest's amendments to its proof of claim.  The court agrees with Qwest; the bankruptcy court's order, issued on October 26, 2006, only ordered Qwest to pay $378,032.57, the amount set forth in Qwest's June 13, 2006 proof of claim and was explicit that it was "without prejudice to Qwest's right to amend its Proof of Claim . . ."

or other costs incurred as a result of the Debtors' breach. (Debtors' Brief on Order to Pay at 8-9.) Qwest argues that this court should defer to the bankruptcy court's interpretation of the Stipulation. (Qwest Resp. on Order to Pay at 13.) The court agrees with the Debtors.

As a preliminary matter, the parties debate the standard of review this court should apply to the bankruptcy court's interpretation of the Stipulation. Qwest argues that the bankruptcy court's interpretation is entitled to a "clear abuse of discretion standard of review because, having previously reviewed and entered an order approving the Stipulation, the bankruptcy court is in the best position to judge its meaning." (*Id.* at 1.) The Debtors disagree and argue that because the Stipulation amounts to a contract, the court must review the bankruptcy court's interpretation *de novo.* (Debtors' Consolidated Reply at 3-7.)

Stipulations by parties are contracts, *see Analytical Eng'g, Inc. v. Baldwin Filters, Inc.*, 425 F.3d 443, 453 (7th Cir. 2005) (citing *Tidemann v. Nadler Golf Car Sales, Inc.*, 224 F.3d 719, 723 (7th Cir. 2000)), and a lower court's interpretation of a contract's language is subject to *de novo* review. *In re Frain*, 230 F.3d 1014, 1017 (7th Cir. 2000) ("We review the bankruptcy and district court's . . . contract interpretations *de novo.*") The cases cited by Qwest do not persuade the court to stray from this well-established principle. Qwest cites two cases where the Seventh Circuit deferred to a lower court's interpretation of its own orders, reviewing only for "abuse of discretion." *See In re Consol. Indus. Corp.*, 360 F.3d 712, 716 (7th Cir. 2004); *In re Chicago Milwaukee, St. Paul & Pacific R.R. Co.*, 974 F.2d 775, 779 (7th Cir. 1992). But, Qwest does not assert that, in this case, the bankruptcy court drafted the Stipulation or worked with the parties to draft the Stipulation. Qwest states only that the bankruptcy court "reviewed and entered an order approving the Stipulation," (Qwest Resp. on Order to Pay at 1), and the Debtors explain that they drafted the Stipulation with Qwest after extensive negotiations. (Debtors' Consolidated Reply at 5.) Thus, the bankruptcy court was not interpreting its own order, but rather contract language negotiated by the parties. As with any other contract, this court will review the bankruptcy court's interpretation of the

Stipulation *de novo. See Harvis Trien & Beck, P.C. v. Fed. Home Loan Mortgage Corp.*, 153 F.3d 61, 66 (2d Cir. 1998) ("The bankruptcy court did not draft the Stipulation, it merely approved the Stipulation as it was required to do by the Code and the Bankruptcy Rules. . . . For purposes of review, the Stipulation is therefore more akin to a run-of-the-mill contract than to a court order, and the bankruptcy court's interpretation of the Stipulation is entitled to no special deference.")

In interpreting Section (j), the court is guided by well-accepted rules of contract interpretation.[4] Courts give meaning to the plain and ordinary language of the contract unless a contract term may be reasonably interpreted in more than one way so as to render the contract ambiguous. *Bland v. Fiatallis North America, Inc.*, 401 F.3d 779, 783-84 (7th Cir. 2005) (citations omitted). While the parties to this appeal interpret Section (j) of the Stipulation differently, neither party argues that the language of the Stipulation is ambiguous. Indeed, the Debtors characterize the wording of the Stipulation as "straightforward" and Qwest discusses "the plain meaning of Paragraph (j)." (Debtors' Brief on Order to Pay at 11; Qwest Resp. on Order to Pay at 16.) Moreover, the parties present no extrinsic evidence to resolve any potential ambiguity. The court therefore will look only to the written language of the Stipulation and will read the Stipulation as a

---

[4]     Debtors do not discuss any choice of law issues in their briefs, nor does Qwest. When discussing the interpretation of the Stipulation, the Debtors cite cases discussing federal common law principles of contract interpretation and also cite cases governed by Illinois state law and Colorado state law, noting that "Qwest argues [Colorado law] is applicable to the Contracts" between Debtors and Qwest. (Debtors' Consolidated Reply at 10.) In their responses, Qwest does not discuss the applicability of the law Debtors' cite. Because the parties have not developed any choice of law arguments, the court will not address the issue at any length. The court notes, however, that the parties' dispute on appeal arises out of the Stipulation the parties entered into during the course of the Debtors' federal bankruptcy proceeding, not the Debtors' contracts to perform construction and maintenance work for Qwest. As a result, the court is guided by federal common law principles of contract interpretation. In any event, Illinois and Colorado state courts are guided by nearly identical rules of contract interpretation, thus the application of either of these state's law would not vary the court's outcome. *See, e.g.*, *Carey v. Richards Bldg. Supply Co.*, 367 Ill. App. 3d 724, 726, 856 N.E.2d 24, 27 (2d Dist. 2006) (stating Illinois rules of contract interpretation); *Grinnell Mut. Reinsurance Co. v. LaForge*, 369 Ill. App. 3d 688, 697, 863 N.E.2d 1132, 1139 (4th Dist. 2006) (same); *First Christian Assembly of God, Montbello v. City and County of Denver*, 122 P.3d 1089, 1092 (Colo. App. 2005) (stating Colorado rules of contract interpretation); *Bush v. State Farm Mut. Auto. Ins. Co.*, 101 P.3d 1145, 1146 (Colo. App. 2004) (same).

whole so as to give meaning to all of its terms.  *Bland*, 401 F.3d at 784; *see also GNB Battery Techs., Inc. v. Gould, Inc.*, 65 F.3d 615, 622 (7th Cir. 1995) (citation omitted) ("A contractual interpretation that gives reasonable meaning to all of the terms in an agreement is preferable to an interpretation which gives no effect to some terms.")

After stating that the Debtors waive and release all claims against Qwest, Section (j) of the Stipulation states, in relevant part, that:

> [T]he Debtor, the estate, and any successor thereto reserve the right to object to the allowance and payment of Qwest's Alleged Claims.  The waiver and release provided for in this paragraph (j) shall not be applicable or effective in the context of an objection to the allowance of Qwest's Alleged Claims; provided, however, that the Debtor shall not have the right (i) to object to the allowance and payment of Qwest's Alleged Claims on the basis of any actions taken by Qwest to mitigate its damages following the Debtor's breach of any Contracts in any Region by completing jobs the Debtor did not complete in accordance with the specifications of any Contracts or on the basis of other costs incurred by Qwest as a result of the Debtor's breach of any Contracts or (ii) to seek any affirmative recovery against Qwest.

(Stipulation ¶ (j).)  The bankruptcy court interpreted Section (j) to mean that if Qwest "*asserts* a claim based on its actions to mitigate damages by completing jobs that the debtor did not complete" or "*asserts* a claim based on other costs incurred by Qwest as a result of the debtors' breach of the contract," the Debtors cannot object to it.  (*See* 10/26/06 Transcript at 13 [emphasis supplied].) Qwest believes this interpretation is correct.  The Debtors disagree.  They argue that Section (j) should be read only to prohibit them from objecting to claims "actually based on 'actions taken by Qwest to mitigate its damages' or 'other costs incurred by Qwest as a result of the Debtor's breach of any Contracts.'"  (Debtors' Brief on Order to Pay at 15.)  Thus, in the Debtors' view, they have the right to object to the allowance of Qwest's Alleged Claims on any basis other than the two specified.  (*Id.* at 10.)  While the court does not adopt the interpretation of either party wholesale, the court's interpretation of Section (j) differs from the bankruptcy court's interpretation.

The Debtors contend that the bankruptcy court erred in ruling that the language "on the basis of" in Section (j) modified the phrase "Qwest's Alleged Claims."  (*Id.* at 11.)  The Debtors read

Section (j) to prevent them from objecting to Qwest's claims if the basis for the objection is any "actions taken by Qwest to mitigate its damages following the Debtor's breach" or if the basis for the objection is "other costs incurred by Qwest as a result of the Debtor's breach of any Contracts." (*Id.* at 15.) Thus, according to the Debtors, Section (j) would preclude an objection that Qwest mitigated improperly or that it "hired Contractor X when it should have hired Contractor Y to mitigate." (*Id.*) Debtors do not explain, however, what type of objections would be based on "other costs incurred by Qwest as a result of the Debtor's breach of any Contracts." Given the plain language of Section (j), the court is not persuaded that the Debtors' reading is correct.

First, the Debtors imply that "on the basis of" should not be read to modify "Qwest's Alleged Claims" because the term "Qwest's Alleged Claims" was found earlier in Section (j) of the Stipulation with no modification. (*Id.*) In the portion of Section (j) in question, the phrase "on the basis of" follows immediately after "Qwest's Alleged Claims" and, when read in context, the fact that earlier references to "Qwest's Alleged Claims" appeared without this modification is not conclusive. Additionally, the Debtors argue that "on the basis of," a singular phrase, should not be read to modify the plural phrase "Qwest's Alleged Claims." (*Id.*) The court does not agree that such a grammatical problem exists. "Qwest's Alleged Claims" is a defined term and again, when taken in context, if it is modified by the phrase "on the basis of," the group of claims that the defined term encompasses is narrowed. Because "on the basis of" immediately follows the defined term "Qwest's Alleged Claims" and such a reading poses no grammatical problem, this court interprets Section (j) based on its plain language and concludes that "on the basis of" modifies "Qwest's Alleged Claims." In other words, this court agrees with the bankruptcy court that by agreeing to Section (j), the Debtors waived their right to object to the payment of Qwest's Alleged Claims that are based on actions taken by Qwest to mitigate its damages following the Debtors' breach or on other costs incurred by Qwest as a result of the Debtors' breach.

In any case, the Debtors' primary contention is that the bankruptcy court erred when it *sua*

*sponte* added the word "asserted" into Section (j).  (Debtors' Brief on Order to Pay at 11.)  The court also views this as a fundamental issue.  The bankruptcy court was explicit that it interpreted Section (j) to prohibit the Debtors from objecting to a claim as long as Qwest *asserts* that the claim is based on actions taken by Qwest to mitigate its damages following the Debtors' breach or on other costs incurred by Qwest as a result of the Debtors' breach.  (*See* 10/26/06 Transcript at 12-13 (Judge Black's articulation of Section (j)).  Debtors contend, however, that Section (j) should not be read to preclude them from objecting to Qwest's claims on the ground that: (1) a claim does not fall into the defined category of Qwest's Alleged Claims at all; or (2) that a claim is not based on actions taken by Qwest to mitigate its damages following the Debtors' breach or on other costs incurred by Qwest as a result of the Debtors' breach.  (Debtors' Brief on Order to Pay at 15.)  Qwest construes the Debtors' position as an effort by the Debtors to retain their right to argue that particular sums sought by Qwest fall outside of their waiver of their right to object, and contends that this interpretation renders the Debtors' waiver of their right to object meaningless. (Qwest Resp. on Order to Pay at 16.)

The Debtors are correct that the plain language of Section (j) does not state that Qwest need only *assert* that its claims are on one of the identified bases to implicate the Debtors' waiver of their right to object.  Moreover, nothing in the plain language of Section (j) prohibits the Debtors from objecting to one of Qwest's claims on the basis that it does not fall into the defined category of Qwest's Alleged Claims at all or is not one of the two types of Qwest's Alleged Claims to which the Debtors cannot object.  Indeed, Section (j) is explicit that the Debtors' waiver and release of its claims against Qwest does not limit their "right to object to the allowance and payment of Qwest's Alleged Claims." (Stipulation ¶ (j).)  Because the parties specifically provided for the Debtors' right to object to Qwest's Alleged Claims, the court can reasonably infer that, to the extent the parties curtailed this right to object, they only intended to do so when the claims at issue fit into the two categories specified in the Stipulation—those based on Qwest's actions to mitigate its damages

17

following the Debtors' breach or those based on other costs incurred by Qwest as a result of the Debtors' breach. But if Qwest need only *assert* that its claims fit into one of these two categories, Debtors' reserved right to object to Qwest's Alleged Claims has little significance; Qwest could simply assert that every claim fits into one of these two categories. Thus, in order to give effect to all of Section (j)'s parts, the court concludes that as a part of the Debtors' general right to object to Qwest's Alleged Claims, the Debtors must be allowed to object when they believe that a particular claim does not fit within the defined category of Qwest's Alleged Claims or that Qwest may have erroneously classified a claim as one of the two types of claims to which Debtors have waived their objection.

Qwest defends the bankruptcy court's interpretation. A construction that bars the Debtors' objection whenever Qwest asserts that one of the exceptions applies does not, Qwest insists, render the Debtors' right to object to Qwest's Alleged Claims meaningless. Qwest correctly points out that it can only obtain funds from the Qwest Setoff Reserve upon joint instructions in writing from Qwest and the Debtors or by an order of the bankruptcy court. (Stipulation ¶ (g).) Qwest argues that the Debtors therefore retain the power to force Qwest to obtain an order from the bankruptcy court by not agreeing to a distribution from the Qwest Setoff Reserve; thus, Qwest contends, the Debtors have merely waived their right to object to Qwest's application to the bankruptcy court where Qwest's claim actually is based on actions it took to mitigate damages following the Debtors' breach or other costs incurred as a result of Debtors' breach. (Qwest Resp. on Order to Pay at 15.) The court disagrees with Qwest's view. It is true, of course, that Qwest does not have unchecked access to the funds in the Qwest Setoff Reserve and that the Debtors can essentially force Qwest to go before the bankruptcy court to obtain release of such funds. The fact that the Debtors can force Qwest to go before the bankruptcy court to obtain an order for the release of funds does not, however, restore the Debtors' right to challenge Qwest's assertion about the nature of the claims; that is, it is not clear that in challenging Qwest's request for funds, the Debtors would be permitted to argue to and demonstrate for the bankruptcy court why particular

claims, though purported to be based on actions it took to mitigate damages following the Debtors' breach of other costs incurred as a result of Debtors' breach, are not actually what Qwest asserts them to be. The bankruptcy court's proceedings in this case illustrate why the Debtors must be able to raise such an objection. Here, the bankruptcy court concluded in open court on October 26, 2006 that the Debtors had waived their objections to Qwest's claims. (10/26/06 Transcript at 13.) That same day, the court entered an order directing the Debtors to pay Qwest the full amount then at issue—$378,032.57—and the record does not reveal that the bankruptcy court conducted its own analysis to ensure that the sums Qwest claimed were eligible for payment from the Qwest Setoff Trust Account; rather, the bankruptcy court merely stated, without any further explanation, that there appeared to be "good cause" to grant the relief requested. (October 26, 2006 Order Directing Debtors to Pay Qwest Corporation's Claims (10/26/06 Order to Pay).)

Nor does this court's construction of Section (j) render the Debtors' waiver of its right to object meaningless, as Qwest contends. Where Qwest's claim is in fact based on actions it took to mitigate damages following the Debtors' breach or other costs incurred as a result of Debtors' breach, the Debtors cannot object. Under this court's ruling, if the Debtors believe that Qwest's claim is not based on such actions or costs, the Debtors can raise an objection to that effect before the bankruptcy court. But, even in this latter case, if the bankruptcy court determines that Qwest accurately characterized its claim, the Debtors cannot contest whether Qwest should be paid or the amount of Qwest's payment. In sum, the court cannot conclude that by waiving their right to object to Qwest's Alleged Claims on the basis of actions taken by Qwest to mitigate its damages or on the basis of other costs incurred by Qwest as a result of the Debtors' breach, Debtors also waived their right to argue that certain claims by Qwest fall outside of these two exceptions.

In light of the above, the court concludes that the bankruptcy court erred in refusing to consider whether the particular claims of Qwest to which the Debtors object—Qwest's claims for attorney's fees and internal costs for salaries and wages—are in fact based on actions taken by

Qwest to mitigate its damages for Debtors' breach or on the basis of other costs incurred by Qwest as a result of the Debtors' breach. As a part of this appeal, the parties have extensively briefed the issue of whether the contested claims fall within the categories of Qwest's Alleged Claims to which the Debtors have waived their right to object and have also submitted briefs on the merits of Debtors' objection that these claims do not represent compensable damages. While the Debtors urge that these questions can be resolved as a matter of law, the parties' briefs illustrate that their resolution may require in-depth factual inquiries relating to the provisions of the underlying contracts between the Debtors and Qwest, as well as Qwest's filings and records on the services provided by their attorneys, and also may involve other factual determinations regarding the nature of the expenses that Qwest claims it should be paid from the Qwest Setoff Trust Account and whether these costs in fact arose from the Debtors' breach. Indeed, in reiterating the objections that they raised before the bankruptcy court, the Debtors list a number of "factual objections" that purportedly call into question "the allowability of most of the claims in dollar volume asserted in the Proof of Claim." (Debtors' Brief on Order Overruling Debtors' Objection at 8.) Because of the factual inquiries that may be necessary to resolve these outstanding questions and given the absence of a record permitting review of the bankruptcy court's determination, the court declines to reach the merits of the parties' arguments at this time. Thus, this court remands the case to the bankruptcy court for further consideration. The bankruptcy court is to reevaluate whether it must consider the Debtors' objections to the categories of Qwest's Alleged Claims discussed herein and, if so, whether the controverted claims constitute damages that are compensable from the Qwest Setoff Trust Account under the Stipulation.

### C.    June 15, 2006 Bar Date for Qwest's Claims

Section (m) of the Stipulation states, in relevant part, that "Qwest shall have until June 15, 2006 to file" with the bankruptcy court a proof of claim or other pleading to recover money with respect to Qwest's Alleged Claims and also provides that this deadline could be extended by the

consent of the parties or court order. (Stipulation ¶ (m).) On October 26, 2006, when the bankruptcy court ordered the Debtors to pay Qwest the sum requested in its June 13, 2006 initial proof of claim, $378,032.57, the bankruptcy court included in its order the statement that Qwest could "amend its Proof of Claim as may be necessary to adjust the amounts asserted therein or to supplement its claim in any way, including but not limited to asserting claims for additional damages resulting from the Debtors' breach of the Qwest Contracts . . . ." (*See* 10/26/06 Order to Pay.)

The Debtors now argue that by including this extension in its October 26, 2002 order, the bankruptcy court did not enforce the Stipulation in accordance with its plain meaning but rather stripped Section (m) of significance and that this extension, which occurred after the June 15, 2006 deadline, was prohibited by Bankruptcy Rule 9006(b). (Debtors' Brief on Order to Pay at 24-25.) As a result, the Debtors contend, any claim asserted by Qwest after June 15, 2006 is barred by Section (m) of the Stipulation and cannot be paid from the Qwest Setoff Reserve. (*Id.* at 26.) Qwest contends that the Debtors' argument is not ripe because the bankruptcy court has not awarded Qwest any sums set forth in its amendments to its proof of claims, which were filed after June 15, 2006. (Qwest Resp. on Order to Pay at 24.) Qwest further argues that the Debtors ignore that Section (m) granted Qwest the right to seek an extension of the June 15, 2006 deadline, and note that its initial proof of claim, filed on June 13, 2006, and all of the amendments to its proof of claim informed the court that its claims were not complete and its damages were not fully tallied. (*Id.*) Thus, Qwest contends, the court's October 26, 2006 order constituted a proper extension for Qwest's filing of amended proofs of claims as authorized in Section (m) of the Stipulation. (*Id.*)

The court disagrees with Qwest that the issue of whether the amendments to its proof of claim were timely filed is not ripe for the court's consideration. When a district court decides an appeal in bankruptcy proceedings, the relevant inquiry is whether an order is final and not whether a dispute is ripe for resolution. *In re UAL Corp. (Pilot's' Pension Plan Termination)*, 468 F.3d 444, 453 (7th Cir. 2006). "If the *order* is final, then an appeal is proper whether or not the dispute is ripe

for resolution." *Id.* Here, the court's October 26, 2006 order stating that Qwest could amend its proof of claim, including asserting claims for additional damages resulting from the Debtors' breach, is a final order. While it is true that the bankruptcy court has not yet interpreted its own order and has not yet ordered the payment of any sums Qwest claimed after June 15, 2006, the court can consider, at this juncture, whether the bankruptcy court's statement that its October 26, 2006 order was "without prejudice to Qwest's right to amend its Proof of Claim as may be necessary to adjust the amounts asserted therein or to supplement its claim in any way, including but not limited to asserting claims for additional damages resulting from the Debtors' breaches of the Qwest Contracts . . ." was proper. (10/26/06 Order to Pay ¶ 3.)

Federal Rule of Bankruptcy Procedure 9006(b), which addresses time periods applicable to bankruptcy court orders, authorizes a bankruptcy court to "at any time in its discretion (1) with or without motion or notice order the [time] period enlarged if the request therefor is made before the expiration of the period originally prescribed or as extended by a previous order or (2) on motion made after the expiration of the specified period permit the act to be done where the failure to act was the result of excusable neglect." FED. R. BANKR. P. 9006(b)(1). Thus, the language of Rule 9006(b)(1) is explicit that the bankruptcy court has the power to enlarge a time period, such as the time period for submitting proof of claims. According to the Debtors, however, when read in conjunction with the Stipulation, Bankruptcy Rule 9006(b) required Qwest to file a motion to extend the June 15, 2006 deadline before its expiration. Because Qwest did not do so, the Debtors urge, its amendments are barred. (Debtors' Brief on Order to Pay at 25.) The court disagrees.

Qwest stated in its June 13, 2006 proof of claim that it "reserve[d] the right to amend [its] proof of claim and this rider as may be necessary to adjust the amount asserted herein or to supplement this claim in any way, including, but not limited to, liquidating, and claiming that all of its damages [were] a result of the Debtors' breaches of the Contracts." (June 13, 2006 Proof of Claim.) As the Debtors observe, this reservation language itself does not qualify as "consent of

the parties" or an order of the court, which would have been sufficient to extend the June 15, 2006 deadline under Section (m) of the Stipulation. The court nevertheless is satisfied that this language was sufficient to serve as a pre-deadline request by Qwest that the bankruptcy court extend the June 15, 2006 filing deadline. Rule 9006(b) is clear that Qwest was not required to formally move for such an extension, nor does the Stipulation require a formal motion; under Section (m) of the Stipulation, a court order is alone sufficient. That the bankruptcy court did not issue its order granting Qwest additional time to amend its proof of claims until October 26, 2006 is not significant. Rule 9006(b) is explicit that the bankruptcy court can enlarge a deadline "at any time in its discretion," and does not preclude that the bankruptcy court may enlarge a time period after it has expired. FED. R. BANKR. P. 9006(b)(1). The Debtors cite no case law to the contrary. Because the bankruptcy court's October 26, 2006 order allowing Qwest to supplement its claims does not contradict the plain language of Section (m) or violate Bankruptcy Rule 9006(b), the court cannot conclude that Qwest's amendments to its proof of claim, filed after June 15, 2006, were untimely.

### D. The Lenders' Standing to Object to Qwest's Claims

As explained above, the Lenders now appeal the bankruptcy court's order striking their objection to the payment of certain categories of Qwest's Alleged Claims from the Qwest Setoff Trust Account. In denying the Lenders' objection, the only rationale the bankruptcy court offered was that the Lenders did not have standing to object to Qwest's claims because the payment of Qwest's claims from the Qwest Setoff Trust Account would not affect property of the Debtors' estate. (10/26/06 Transcript at 14.) In other words, in the bankruptcy court's view, the payment of Qwest's claims would not affect property in which the Lenders had an interest.

In this appeal, the Lenders argue that the bankruptcy court failed to recognize that the Debtors, and the Lenders as lien-holders, have an economic interest in the money in the Qwest Setoff Trust Account regardless of whether the account was the property of the estate because any amount remaining in the trust account would be paid to the Debtors' estates. (Lenders' Brief at 9.)

Thus, the Lenders argue, they do have an economic interest in the determination of the proper amount of Qwest's claims. (*Id.* at 9.) Moreover, the Lenders challenge the bankruptcy court's failure to recognize their statutory right to object to Qwest's claims as a party in interest under Section 502(a) of the Bankruptcy Code. (*Id.* at 10.) Finally, the Lenders contend that the Stipulation does not preclude them from objecting to Qwest's claims because it is not binding on the Lenders and does not operate as a waiver of the Lenders' right to object to Qwest's claims. (*Id.*)

Qwest again defends the bankruptcy court's ruling. Qwest insists that the funds at issue are not the property of the bankruptcy estate and therefore the Lenders have no standing to object to their distribution. The Lenders' potential interest in the remainder of the funds at issue, Qwest urges, does not grant the Lenders an interest in how the remainder is derived. Qwest notes, further, that the Lenders could have objected to the Stipulation at the time of its entry if they believed it would affect their rights and waived their right to object by not doing so. (Qwest Resp. to Lenders' Brief at 10, 16.) Finally, Qwest contends that the Qwest Setoff Reserve represents funds that Qwest had the right to recoup and that neither the Lenders nor the bankruptcy estate had any right to those funds, that Section 502 of the Bankruptcy Code is not applicable, and that the Lenders are equitably estopped from objecting to Qwest's claims because they have accepted the benefit of the Stipulation as a result of Qwest's payments to the Debtors pursuant to the Stipulation. (*Id.* at 10, 15, 18.) This court reviews the bankruptcy court's ruling on the Lenders' standing *de novo* or without any deference to the bankruptcy court.[5] *See Protestant Mem'l Med. Ctr., Inc. v. Maram*, 471 F.3d 724, 729 (7th Cir. 2006) ("Because the nature and scope of [standing and mootness] doctrines are issues of law, our review is *de novo*.") The court concludes that the Lenders have standing to object to Qwest's claims and remands the case to the bankruptcy court

---

[5]     The Lenders contend that the bankruptcy court's ruling should be reviewed *de novo*, (Lenders' Brief at 1), and Qwest does not disagree.

to consider the Lenders' objections.

First, the court agrees with the Lenders that they are "part[ies] in interest" under Section 502(a) of the Bankruptcy Code. Section 502(a) of the Bankruptcy Code provides, in relevant part, that a "claim or interest, proof of which is filed under Section 501 of this title, is deemed allowed unless a party in interest . . . objects." 11 U.S.C. § 502(a). Parties in interest under Section 502(a) "include not only the debtor, but anyone who has a legally protected interest that could be affected by a bankruptcy proceeding." *Adair v. Sherman*, 230 F.3d 890, 894 n.3 (7th Cir. 2000) (citing *In re FBN Food Servs.*, 82 F.3d 1387, 1391 (7th Cir. 1996)). Creditors are considered parties in interest under Section 502(a) and have standing to object to other creditor's claims. *See Adair*, 230 F.3d at 894 n.3 ("Therefore, if one creditor files a potentially fraudulent proof of claim, other creditors have standing to object to the proof of claim.")

It is undisputed that the Lenders are creditors of the Debtors. At the time the Debtors filed for bankruptcy, they owed the Lenders over $100 million dollars. (Lenders' Brief at 3.) Thus, if Qwest is also a creditor of the Debtors, as the Lenders contend, the Lenders have standing to object to Qwest's claims as parties in interest under Section 502(a). Qwest argues that Section 502 of the Bankruptcy Code is not applicable because it is not a creditor claiming estate property. (Qwest Reply to Lenders' Brief at 15.) According to Qwest, it is not a "creditor" because the funds in the Qwest Setoff Trust Account do not represent monies owed by Debtors to Qwest but rather Qwest's own funds that only become due to the Debtors once the Debtors satisfy Qwest's breach and mitigation damages. (*Id.*) In Title 11 of the Bankruptcy Code, a "creditor" is defined, in relevant part, as an "entity that has a claim against the debtor that arose at the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10)(A). In the court's view, it is merely a matter of semantics whether the funds in the Qwest Setoff Trust Account are viewed as Qwest's money that later may become due to the Debtors or the Debtors' money that Qwest claims it is owed. In any case, Qwest's status as a creditor is verified by its participation in the Debtors' bankruptcy

proceedings, including that it has filed proof of claims against the Debtors. *See* 11 U.S.C. §
101(10)(A). The court therefore agrees with the Lenders that Qwest cannot "[avail] itself of the
benefits of being a creditor" by filing proof of claims and then deny its status as a "creditor."

Even if it is considered a creditor, Qwest argues, the Lenders do not have a claim or interest
to any money held in the Qwest Setoff Trust Account until Qwest has recouped its mitigation and
breach damages. Thus, according to Qwest, the Lenders have no legally protectable interest in
the funds in the Qwest Setoff Trust Account so as to give them standing to object under Section
502(a). *See Adair*, 230 F.3d at 894 n.3 (citing *In re FBN Food Servs.*, 82 F.3d at 1391) (parties in
interest under Section 502(a) include the debtor and "anyone who has a legally protected interest
that could be affected by a bankruptcy proceeding"). The Lenders argue that the proper
determination of Qwest's claims will affect property of the Debtors' estate "because the Debtors'
contingent or reversionary interest in the Qwest Setoff Reserve constitutes property of the estate."
(Lenders' Brief at 10.) The court does not find this latter argument persuasive. Even if "property
of the estate" is construed broadly, as the Lenders urge, (*Id.* at 11-12), the Stipulation's plain
language is clear that the funds in the Qwest Setoff Trust Account do not constitute property of the
estate. It would therefore defy logic for the court to conclude that the Lenders' contingent or
reversionary interest in funds that the parties specified are not property of the Debtors' estate
nevertheless constitutes property of the Debtors' estate.

In any case, the bankruptcy court's and Qwest's focus on whether Qwest's claims are
against property of the estate may be misdirected. That determination is not dispositive of whether
the Lenders have standing to object to Qwest's claims, the only question presently before this court.
Even though the Stipulation is explicit that the funds at issue do not qualify as "property of the
estate," it is not disputed that the Lenders have a reversionary interest in these funds. Qwest
contends that the Lenders nevertheless become an interested party only if the remainder of the
funds actually exists and that the Debtors and the Lenders have no rights to the Qwest Setoff

Reserve, which represents funds that Qwest has the right to recoup. (Qwest Resp. to Lenders' Brief at 10.) The court does not view the Lenders' interest as narrowly as Qwest urges.

Under the unique arrangement established by the Stipulation, it is not Qwest alone that has rights to the funds in the Qwest Setoff Trust Account as Qwest argues. (*See id.* at 10 ("[T]he Qwest Setoff Reserve represents funds that Qwest had the right to recoup and to which neither the Lender nor the bankruptcy estate ever had any rights.").) Although the funds in the Qwest Setoff Trust Account are intended to facilitate Qwest's right of recoupment, the Stipulation provided for a lump sum of $500,000 to be placed in that account and acknowledged that Qwest may be entitled to more or less than that amount; in the case that Qwest is entitled to less than $500,000, the remainder becomes part of Debtors' estate. (*See* Stipulation ¶ (q) (specifying that any balance remaining in the Qwest Setoff Trust Account after the resolution of Qwest's claims would be transferred to the Debtors and constitute property of the Debtors' estate).) Qwest only has an interest in those funds it is entitled to recoup—the amount of funds that it can establish it is owed as a result of the Debtors' breach, which may or may not be the entire $500,000—and the Debtors (and therefore the Lenders as lien-holders) have an interest in the funds that Qwest is not entitled to recoup. Naturally, the Debtors and the Lenders are therefore both interested in the proper determination of Qwest's claims against the Qwest Setoff Trust Account. Thus, the Lenders' interest in the funds in the Qwest Setoff Trust Account, as described above, is sufficient to constitute a "legally protectable interest" that gives Lenders standing to object under Section 502(a) of the Bankruptcy Code, regardless of whether Qwest's claims are considered to be against property of the Debtors' estate.

Qwest cites to a number of cases to establish its equitable right to assert claims against the Debtors due to their lack of performance under the contracts and to withhold payment to the Debtors until it has recouped its costs. (Qwest Resp. to Lenders' Brief at 10-11.) The Lenders do not dispute that Qwest has this right, nor does the court reach a different conclusion. Qwest cites

these same cases, none of which are binding on this court, to establish that the Debtors and Lenders only had rights to the funds left over after deducting Qwest's mitigation and breach damages and therefore only become a party in interest when such left over funds actually exist. (*Id.* at 12.) But none of these cases present facts analogous to the Stipulation's unique arrangement, which, as described above, caused a lump sum of money to be set aside while acknowledging that Qwest may only be entitled to a portion of the sum, leaving the remainder for the Debtors' estate. Moreover, while the cases Qwest cites do illustrate that a bankruptcy estate's right to funds does not materialize until after a creditor's recoupment, none of these cases address issues relating to standing, which is the issue before the court in Lenders' appeal. *See McDonald v. Ocilla Cotton Warehouse*, 224 B.R. 862, 867-68 (Bankr. S.D. Ga. 1998); *In re A&C Elec. Co. v. Meade Elec. Co.*, 211 B.R. 268, 273-74 (Bankr. N.D. Ill. 1997).

Having concluded that the Lenders have standing to object to Qwest's claims as interested parties under Section 502(a) of the Bankruptcy Code, the court turns to Qwest's remaining arguments as to why the Lenders nevertheless should be precluded from raising such objections. Qwest argues that the Lenders waived their rights and are estopped from objecting because they did not raise an objection until seven months after the Stipulation was entered and accepted benefits of the Stipulation (e.g., Qwest's payment of funds to the Debtors to satisfy the Lenders' interest). (Qwest Resp. to Lenders' Brief at 16.) The Lenders argue that their decision not to object to the entry of the Stipulation was not a waiver of their right to object to Qwest's claims and that, to the extent the Stipulation included a waiver of the Debtors' right to object to Qwest's claims, such a waiver is not binding upon the Lenders. (Lenders' Brief at 17, 19.) The Lenders further contend that they are not equitably estopped from objecting to Qwest's claims. (*Id.* at 13-14.) For the reasons explained below, the court cannot conclude that the Lenders waived their right to object to Qwest's claims by not objecting to the Stipulation when it was entered or that the Lenders are otherwise estopped from objecting to Qwest's claims.

Waiver is the "intentional relinquishment of a known right." *United States v. Charles*, 476 F.3d 492, 495 (7th Cir. 2007) (citing *United States v. Baretz*, 411 F.3d 867, 875 (7th Cir. 2005)). Qwest views the fact that the Lenders were given notice of the Stipulation but did not raise an objection "to the procedures set forth in the Stipulation" until many months after the Stipulation's entry and that Lenders have "accept[ed] $7.4 million of benefit derived from the Stipulation" as evidence that Lenders have waived their right to object "to the burdens of the Stipulation." (Qwest Resp. to Lenders' Brief at 16-17.)  It is undisputed that the Lenders were given notice of the Stipulation at the time of its entry, but Qwest overstates the importance of the Lenders' failure to the object to the Stipulation at that time.

Though the Stipulation provided for a streamlined process to resolve Qwest's claims while also ensuring that the Debtors and subcontractors would be paid for the work they had performed, the Stipulation did not resolve any of Qwest's claims.  As the Lenders point out, the Stipulation provided that Qwest's claims would be paid pursuant to an agreement between the Debtors and Qwest or court order, a provision that anticipates future controversy over Qwest's claims. (Stipulation ¶ (g).)  Thus, by not objecting to the entry of the Stipulation, the Lenders only waived their right to object to the streamlined process set forth in the Stipulation.[6]  The Lenders did not, however, waive their right to object to subsequent determinations as to the validity of particular claims brought by Qwest.  To illustrate this distinction, the Lenders' failure to object at the time the bankruptcy court entered the Stipulation would likely prohibit the Lenders from later protesting the deposit of funds into the Qwest Setoff Trust Account, a mechanism that was provided for in the Stipulation.  The Lenders are not, however, prohibited from protesting whether Qwest's

---

[6]    In the court's review of the record, the Lenders do not appear to have ever objected to the procedures set forth in the Stipulation.  The Lenders admit that they do not find the Stipulation objectionable.  (Lenders' Reply at 8.)

claims—brought subsequent to the Stipulation's entry—are of the type that properly can be paid from the Qwest Setoff Trust Account.

To the extent the Debtors have waived their rights to object to Qwest's claims in certain circumstances, the court concludes that this waiver is not binding on the Lenders. As the court explained above, its interpretation of the Stipulation is governed by its plain language. *See Bland*, 401 F.3d at 783-84 (citations omitted). The Stipulation expressly provides that it is binding only on the Debtors, Qwest and their successors and assigns, including any trustee under Chapters 7 or 11. (Stipulation ¶ (v).) The Stipulation does not provide that it is binding on the Lenders, who are not signatories to the Stipulation. Thus, the Stipulation's clear language runs contrary to Qwest's argument. The Lenders cite a number of cases that purportedly establish that a debtor's waiver of its right to object to a creditor's claim does not waive the right of other parties to object to a creditor's claim. *See In Re UNR Indus., Inc.*, 71 B.R 467, 477 (Bankr. N.D. Ill. 1987); *In Re FCX, Inc.*, 54 B.R. 833, 842 (Bankr. D. N.C. 1985); *In re UAL Corp.*, Case No. 02-48191, Transcript of April 30, 2003 Hearing (Bankr. N. D. Ill.) (Ex. 11 to Lenders' Brief). Qwest argues that these cases are of little assistance to the Lenders, primarily because of the Lenders' failure to object to the Stipulation while enjoying the benefits of the Stipulation. (Qwest Resp. to Lenders' Brief at 17-18.) The court need not discuss these non-binding cases at any length. The cases cited by the Lenders do not further an argument that the Debtors' waiver of its right to object to Qwest's claims could bind the Lenders. Nor has Qwest cited any authority in support of that proposition. Given the clear language of the Stipulation and the lack of contrary authority, the court concludes that, to the extent the Debtors' have waived their rights to object to Qwest's claims, the waiver is not binding on the Lenders.

Qwest's final argument is that the Lenders are equitably estopped from raising their objections. To establish estoppel, a party must show that another "made a misleading representation on which the . . . party reasonably relied to its detriment." *See Contempo Design,*

*Inc. v. Chicago and N.E. Ill. Dist. Council of Carpenters*, 226 F.3d 535, 548 (7th Cir. 2000). In asserting equitable estoppel, Qwest contends that it detrimentally relied on its right to recoup its breach and mitigation damages under the Stipulation when it paid out an excess of $7.4 million to the Debtors and that the Lenders have accepted the benefit of Qwest's payments to the Debtors. (Qwest Resp. to Lenders' Brief at 18.) The court finds nothing inequitable about allowing the Lenders to object to Qwest's claims despite the fact that the Lenders have arguably benefitted from Qwest's substantial payment to the Debtors under the Stipulation. The Stipulation benefitted both the Debtors (and thereby the Lenders as lien-holders) and Qwest. In the Stipulation, Qwest agreed, to the Debtors' benefit, to pay the Debtors for the work the Debtors had performed, and the Debtors agreed, to the Lenders' benefit, that $500,000 would be set aside as security for the payment of Qwest's Alleged Claims. Nowhere in the Stipulation did the parties agree that all of Qwest's claims would be automatically allowed. Indeed, as stated earlier, by providing that payment of Qwest's claims may have to occur by court order, the Stipulation anticipated controversy over the payment of some of Qwest's Alleged Claims. Because Qwest was not guaranteed the payment of its claims without objection, the Lenders' acceptance of any benefit derived from Qwest's payment of $7.4 million to the Debtors does not preclude the Lenders from exercising their right, as parties in interest, to object to the validity of Qwest's claims.

## CONCLUSION

For the reasons explained above, the court vacates and remands the bankruptcy court's orders that are the subject of the Debtors' appeals in Case Nos. 06 C 6305 and 06 C 6306 and the Lenders' appeal in Case No. 06 C 6304. The bankruptcy court is to reevaluate whether it must consider Debtors' objections to Qwest's Alleged Claims for certain attorney's fees and internal wages and salaries paid after Debtors' breach. If so, the bankruptcy court must then consider whether these controverted claims constitute damages that are compensable from the Qwest Setoff

Trust Account under the terms of the Stipulation. The bankruptcy must also consider the Lenders' objections to Qwest's claims.

ENTER:

Dated: August 9, 2007

REBECCA R. PALLMEYER
United States District Judge